**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| Parke W. Little, | ) | |
| | ) | |
| Plaintiff, | ) | **ORDER RE MOTIONS FOR** |
| | ) | **SUMMARY JUDGMENT AND** |
| vs. | ) | **DISMISSING ACTION** |
| | ) | |
| Charles A. Rummel, Stewart Stenberg, | ) | |
| Matthew Kolling, and Clarence A. Tuhy, | ) | |
| in their official and individual capacities; | ) | |
| City of Dickinson, North Dakota; and | ) | |
| County of Stark, North Dakota; | ) | Case No. 1:12-cv-113 |
| | ) | |
| Defendants. | ) | |

In this action, plaintiff Parke W. Little is suing over several matters related to his employment and termination as a police officer for the City of Dickinson, North Dakota. Named as defendants are the City of Dickinson, former Police Chief Rummel, former Police Captain Stenberg, and City Attorney Kolling (collectively "City defendants") as well as Stark County and Sheriff Tuhy (collectively "County defendants"). Before the court are motions for summary judgment brought by the City defendants, the County defendants, and plaintiff Little.

Unless otherwise indicated, the following facts are either undisputed or have not been properly or sufficiently controverted.

# I.  BACKGROUND

## A.  Little's employment with the Dickinson PD

Little was employed by the Dickinson Police Department for approximately five and one-half years before he was terminated by Chief Rummel on June 30, 2008. At the time of his termination,

Little was a sergeant in the Department.

**B.**     **The complaint of use of unauthorized and improper force**

An intra-departmental complaint for personnel action was lodged against Little on June 19, 2008. The complaint alleged that Little had used unauthorized and improper physical force against two persons who had been arrested by other officers on June 16, 2008, after they had been involved in a motor vehicle accident and had fled on foot. The driver, Tye Maus, was detained after a pursuit to a nearby church. The passenger, Kristi Kuntz, was located a short time later by another officer in a slough a further distance away.

The specific allegations set forth in the complaint brought against Little were that:

> Sgt. Little used unauthorized physical force on Tye Maus in an attempt to gain information from after Maus had invoked his right to remain silent & speak to any [sic] attorney. Inappropriate & excessive force used on Kristi Kuntz when Sgt. Little used her handcuffed arms/hands to lift her from the ground.

(Doc. No. 1-5). The complaint, which was signed by Captain Stenberg, identified the complainant as: "Captain Stewart Stenberg based on verbal complaints from Tye Maus & Officer Staten." (Id.).

The Dickinson Police Department has a detailed written policy for investigating and deciding complaints made against officers. The policy provides for the use of a standard-form complaint, which, on the back, has spaces to be completed by the various departmental officers and officials as they complete their part of the investigation and decision process. The policy also provides detailed procedures for the investigation of the complaint, including interviewing witnesses and obtaining a statement from the officer that is the subject of the complaint. (Doc. No. 1-7).

**C.**     **Lt. Shirey's investigation**

The investigation of the complaint against Little was assigned to Lt. Rick Shirey. Following the Department's policy, Shirey interviewed most of the witnesses as well as Little. In addition, Lt.

Shirey reviewed a DVD of a recording from the patrol vehicle in which Maus was placed as well as written reports prepared by several of the officers.

Following the completion of the investigation, Lt. Shirey prepared a detailed report that was a little over four single-spaced, typewritten pages. According to the report, the persons he interviewed advised him of the following:

- Tye Maus (one of the subjects of the police pursuit) stated that, after he advised officers he did not want to make any statements and was placed in a patrol vehicle, Little reached into the vehicle, put a hand on the back of his neck, and attempted to apply pressure while asking him the identity of the female passenger and where she had gone. Maus advised that he then said something to the effect of "what's this pressure point sh*t?" At that point, according to Maus, Little stopped applying the pressure to his neck.

- Officer Tom Grosz (who was one of the officers who had arrested Maus and placed him in the back of the patrol vehicle) stated that, after Maus refused to answer Little's questions, he observed Little take his left hand, reach across Maus's body, and place his fingers on either side of Maus's throat from the front at about the Adam's apple. Officer Grosz stated that, while Little was doing this, he continued to question Maus about the female passenger. Officer Grosz stated Little did this for a short period of time and that, when he removed his hand, Maus said something to the effect of "what's this pressure point sh*t." Officer Grosz stated that Maus was subsequently taken away in an ambulance because he had been slightly injured in the accident.

3

- Officer Mike Hanel advised he did not observe what occurred with respect to Maus because he had gone in search of the female passenger, who was later determined to be Kristi Kuntz. Officer Hanel stated that Officer Wallace was the first one to locate Kuntz and that Hanel responded to the location where she was found. Hanel stated he placed Kuntz in handcuffs while she was on the ground with her hands behind her back. By that point, according to Hanel, Little had also arrived. Hanel stated, that when he completed cuffing Kuntz, Little grasped the connecting chain between the cuffs and lifted Kuntz to her feet. Hanel stated that Kuntz cried out that Little was hurting her when he did so. Hanel stated that, when Little lifted Kuntz to her feet using the handcuff chain, he did not support her in any other manner and that this caused the handcuffs to dig into Kuntz's wrists and her arms and shoulders to be hyper-extended upward. Hanel stated that Kuntz had not been resisting and was compliant. Finally, Hanel reported that later, when he was at the emergency room, Maus told him that Little had placed his hands on his throat in an attempt to apply a pressure-point hold.

- Officer Nic Gates advised that he assisted Hanel in handcuffing Kuntz. Gates stated that, after Kuntz was cuffed, Little grabbed only the handcuff chain and pulled Kuntz to her feet. Officer Gates indicated that, when Little did so, Kuntz yelled "owie" and that she was being hurt. Officer Gates indicated he believed Kuntz's pain was real as her hands were behind her back so that, when Little grabbed the cuffs to pull her up, her arms and shoulders were bearing her full weight. Officer Gates stated he heard Little say words to the effect of "you shouldn't run from the

police" when he was pulling Kuntz to her feet.

- Kuntz, in a brief interview, advised she was handcuffed behind her back and raised to her feet by an officer standing behind her using only the handcuffs and not her arms.

- Little, in his interview with Lt. Shirey, claimed he raised Kuntz to her feet from a prone position using only her arms and not the handcuffs - contrary to what the other officers who were present and Kuntz had reported. Little also denied placing his hands on Maus's neck or applying any pressure-point hold. Little claimed he only asked Maus about the location of the female passenger because he was concerned that she too might be hurt. Little stated that, when he leaned into the vehicle to ask about the female passenger and Maus turned to him, he thought Maus was going to spit on him so he used his right hand to push Maus's head away. He said his hand came in contact only with Maus's head or jaw and that he did not touch his throat or neck. Again Little's account was materially different from those of Officer Grosz and Tye Maus.

(Doc. No. 39-3).

In addition to what Lt. Shirey learned during his interviews, Shirey also reviewed the written reports that had been prepared by the officers involved contemporaneous with the incidents. One was a report prepared by Officer Hanel. Hanel's report tracked what he verbally told Lt. Shirey as set forth above. In addition, the report stated that, when Little pulled Kuntz up by the handcuff chain, "Kuntz exclaimed 'ow ow ow' and 'you are hurting me' several times as she was lifted from the ground." (Doc. No. 39-2). The other report was from Officer Grosz. His report was also

consistent with what he orally reported to Lt. Shirey during his interview. In part, the report states:

> While I was standing near the driver's side rear of the car, Sgt. Little spoke with Tye. Sgt. little [sic] asked him several times about the identity of the female that was with him. I was still standing near the trunk when Sgt. Little began to perform a "choke hold"/pressure point to Tye's neck. Sgt. Little grasped Tye above the adam's apple and near the base of his jaw. While he was doing this he continued to ask Tye what the female's name was and repeatedly said something to the effect of "I can't hear you." Tye said something to the effect of, "What's this pressure point bullsh*t?"

(Doc. No. 39-1).

Based on his investigation, Lt. Shirey made the following findings of fact in his investigation

report:

1) With regard to the allegation that Sgt. Little attempted to use some type of pressure tactic to coerce information from a prisoner who had invoked Miranda rights.

In listening to the audio recording of the incident, Sgt. Little can be heard asking the alleged victim, Tye Maus, who the girl was and her name. At no time is there heard any explanation to Maus regarding concern for the welfare of the girl or her potential injuries as Little claims. Officer Tom Grosz stated that he was able to see Sgt. Little's hand on the front of Maus's throat. Maus said that Little's hand was on the back of his neck. As all three statements are in conflict, there is insufficient evidence to make a definitive conclusion as to whether Sgt. Little was utilizing his hand to apply a pressure point tactic to Maus. It is clear that Sgt. Little did not make the claimed statements to Maus explaining his concerns and reasons for eliciting the information. He also employed a method that resulted in unnecessary contact with the prisoner whether he was asking for incriminating statements or not.

2) With regard to the allegation that Sgt. Little used excessive and inappropriate force in effecting the arrest and taking of Kristi Kuntz into custody.

During the questioning of Sgt. Little regarding his actions during this incident, he was uncertain as to where on the arm he might have taken Kristi Kuntz while bringing her to her feet. He was also uncertain as to who else was assisting with this process. The statements provided by Senior Officers Nic Gates and Mike Hanel are clear and direct. Each recalled specifically where they were, who was with them and what each was doing as a part of the arrest and handcuffing process. Each individually stated the same view of the incident and both statements are in agreement. The conclusion is that Sgt. Little did use unnecessary force and acted inappropriately when he gripped the chain connecting the handcuffs that were in place on Kristi Kuntz to lift her to her feet with no other support being provided.

3) That, in addition to the above allegations, there exists reason to believe that Sgt. Little did not answer to these allegations in an honest and forthright manner as

would be expected of someone in his position of authority and responsibility.

While there could be some room for doubt regarding the exact nature of Sgt. Little's actions toward Tye Maus, there is no room for doubt with regard to his actions toward Kristi Kuntz. Sgt. Little's statements are at wide variance with those provided by other officers that were present and involved as well as the victim herself.

(Doc. 39-3). Lt. Shirey then concluded the report by making a recommendation as required by the

Department's policy. His recommendation was:

From the information gathered in this administrative review, it is evident that there exists reason to forward these findings to the Chief of Police and Assistant Chief for administrative disposition.

(Id.). Finally, Lt. Shirey completed the portion of the complaint form entitled "TO BE

COMPLETED BY INVESTIGATING OFFICER." In that portion of the form, he indicated that he

received the request to undertake the investigation on June 17, 2008, and completed the investigation

along with his report on June 27, 2008. He then handwrote in on the space provided the following:

Allegation 1) not sustained
Allegation 2) sustained

(Doc. No. 1-5).

### D. Capt. Stenberg's recommendation

Lt. Shirey provided his report to defendant Capt. Stenberg. Stenberg, in turn, reviewed the

report and provided Chief Rummel with the following memorandum outlining his conclusions and

recommendation:

TO: Chief Charles Rummel
DATE: 06/30/08
FROM: Captain Stewart Stenberg
SUBJECT: Complaint Against Police Officer

I have reviewed the report provided to me by Lt. Shirey regarding the investigation into certain acts by Sgt. Little that were alleged to have occurred during the arrest of two subject [sic] involved in a motor vehicle accident and subsequent fleeing from investigating officers

7

who responded to the scene.

I find that the facts, evidence and statements in this matter reflect that Sgt. Little did attempt to inflict pain to Tye Maus in an effort to gain information from him regarding the identity of his female passenger. Mr. Maus was handcuffed at the time and in custody within the patrol car, and as well, had previously invoked his right to remain silent. Sgt. Little denies any that [sic] such physical force was intentionally applied to gain compliance from Mr. Maus. Sgt. Little's statements are contrary to information recorded on the vehicle's DVD audio system as referenced in Lt. Shirey's investigative material. Sgt. Little's statements are also contrary to Officer Grosz's observation at the scene.

Secondly, I find that Officer Little acted in total disregard of pain and possible injury that was inflicted upon the person of Kristi Kuntz when he lifted her from the ground using only the handcuff chain links. This is totally contrary to proper techniques that must be used regarding handcuffing and assisting an arrestee from the prone position. Sgt. Little has openly denied that this was done, which is totally contrary to statements from the victim and other officers at the scene. It must be noted that Sgt. Little never did submit an investigative report regarding his participation in this event. Perhaps proper documentation of his participation would have properly served to refresh his memory.

I find that Sgt. Little has severely damaged the reputation and character of this agency as well as his own. Sgt. Little's integrity is very questionable, at best, and I find that he has not adhered to high moral principles or professional standards that are demanded by a person in his supervisory position. Sgt. Little's leadership capabilities and the ability to properly mentor and supervise his staff has been irreparably damaged.

It is, therefore, my recommendation that Sgt. Little's employment with this agency be terminated immediately based on all of the information contained within this report. As police officers, we are charged with the responsibility of preserving and protecting the constitutional rights of our citizens and, regardless of stature or status, treating them with respect and in a professional manner. The integrity of a police officer in this profession is paramount and I find that Sgt. Little has been untruthful and very deceptive in this matter.

(Doc. No. 39-4). In addition, Stenberg completed the portion of the complaint form entitled "TO

BE COMPLETED BY OPERATIONS DIVISION COMMANDER - FINAL REVIEW." There

Stenberg indicated he had completed his review on June 30, 2008, and that his recommendation was

"Termination" based on his memorandum. (Doc. No. 1-5).

### E.    Little's termination

On the same day that Stenberg completed his review according to his memorandum, Chief Rummel and Stenberg met with Little in Stenberg's office and advised Little that he was being terminated but would be given the option of voluntarily resigning.  Rummel also on June 30, 2008, completed the portion of the complaint form entitled "TO BE COMPLETED BY CHIEF OF POLICE - FINAL DETERMINATION" by checking the box indicating that the allegations had been sustained and stating that the final disposition was:  "Dismissed – unless notified by Sgt. Little or his attorney differently."  (Doc. No. 1-5).

The record is sparse in terms of what transpired during Rummel's and Stenberg's meeting with Little on June 30, 2008, and particularly whether Little was given an opportunity to respond to (1) the administrative charges being brought against him beyond the opportunity he had earlier been given by Lt. Shirey (which was documented in Shirey's report and had been reviewed by Stenberg and Rummel), and (2) the appropriateness of termination as opposed to some lesser discipline.  One item of evidence which suggests that Little was given an opportunity to be heard at that meeting was a subsequent letter written by Rummel to Little that reads as follows:

July 15, 2008

Mr. Parke Little
10839 35 St SW
Dickinson, ND 5860 l

This letter is to inform you that your services will no longer be required at the Dickinson Police Department as per our conversation dated June 30, 2008.  **This decision was based upon the documentation that was discussed with you on that day and has been provided to your attorney**.

You were informed on June 30th in Captain Stenberg's office as you may recall, that your termination would take effect on that day and were also given the option to resign.  Your request was to first speak with Mr. Mike Geiermann before making that decision.  You were informed at that time that you could consult with him but the termination was effective

immediately at 2:15 pm.  You were also asked to bring in all your gear to Captain Stenberg the next day as a result of your termination.  I did in fact receive a call from Mr. Geiermann on July 9th stating you would resign.  He instructed me to call you & request the one line resignation.

Please forward a copy of your letter of resignation to this agency as agreed upon by yourself and your counsel.

Sincerely,


Charles Rummel
Chief of Police

(Doc. No. 39-5) (emphasis added).  Another item of evidence suggesting that Little was given an opportunity to be heard at the June 30 meeting with Rummel and Stenberg is the following deposition testimony of Lt. Wallace, who spoke with Rummel following the meeting with Little:

> Q.      Okay.  Now, let's turn the attention to, you know, Parke's situation.  And do you recall the Chief made the determination to terminate him?
>
> A.      We were told about it after the fact, yes.
>
> Q.      Okay.  Did you agree with that?
>
> A.      He told us – me, when he came out of that meeting, that he had released him because he had not been truthful in their hearing, meeting, whatever you call it.  Anything beyond that, was that he was going to be demoted, and when he would not allocute to it in their meeting, the determination was that he would be released and terminated, and that was what he had told us.

(Doc. No. 50-3, p. 9).

## F.      The Civil Service Commission hearing, decision, and lack of an appeal

Little ultimately decided not to submit his resignation.  On July 24, 2008, his attorney requested a hearing before the City's Civil Service Commission.  (Doc. No. 39-7).  According to the City's governing ordinance, the Civil Service Commission was required to hold the hearing not less than ten and not more than twenty business days after an appeal had been filed.  (Doc. No. 57-1).

Initially, the City took the position that Little's request was untimely because it had not been

made within five days of the date of his termination, which Chief Rummel contended took place on June 30, 2008. Later, after Little's attorney filed a petition for a writ of mandamus in state court to require that the City provide the hearing, the City reversed course and, in January of 2009, stated it would provide a hearing.[1]

The hearing was not held until August 27, 2010, however, some eighteen months after the City agreed to provide the hearing and just over two years following Little's termination. While the record is sparse in terms of the reasons for the delay beyond the point when it was determined a hearing would be provided, there is some suggestion that Little's and his attorney's conflicting schedules were the primary reasons. (Doc. No. 54-1, p. 31).

According to the minutes and hearing transcript, the hearing lasted a little over two hours. Present were the five commissioners along with Little and his attorney,[2] the City Attorney, Chief Rummel, Sheriff Tuhy, and several other persons. At the beginning of the hearing, Little's counsel and the City Attorney both made opening statements. Little's attorney then called Little to testify and the City Attorney called Chief Rummel. In addition, exhibits were introduced including Lt. Shirey's report and the written reports of the officers. (Doc. No. 54-1).

During the hearing, Little disputed the allegations that he had used unauthorized and excessive force. He denied employing any pressure-point hold on Maus and pointed to Lt. Shirey's conclusion that this allegation was not sustained. He also denied raising Kristi Kuntz to her feet

---

[1] The reason for this reversal appears to have been the ambiguity created by Rummel having given Little some time to consult with an attorney about the option of resigning and the fact the hearing was requested within five days of when Little acknowledged on July 22, 2008, receipt of Rummel's July 15 letter, which suggested Little at that point had more time. (Doc. No. 54-1, p. 31).

[2] The attorney who represented Little at the hearing is different from the one who provided him advice earlier. Neither represents Little in this action.

using the handcuffs.  Little claimed that the real reason he was terminated was because of prior run-ins he had with Capt. Stenberg as well as his having made complaints about matters within the Department, some of which involved alleged improprieties committed by Stenberg and Chief Rummel.  In particular, Little referenced several specific "incidents," most of which he later detailed in his complaint in this action.  Little claimed allegations of use of improper force, which he denied, and his being untruthful about it were simply an excuse for Rummel and Stenberg to get rid of him. (Id. at pp. 3-15).

In addition, Little also complained during his hearing about the process leading up to his termination.  He argued it was improper under the Police Department's policy for the Capt. Stenberg to have initiated the complaint and then later decided it.  He also contended he was not given an "exit interview" as required by the City's personnel policies, which he claimed trumped the Police Department's policy.  Notably, however, neither Little nor his attorney complained about the delay in the holding of the hearing.  (Id.).

Chief Rummel stated during his testimony that the decision to terminate Little was his.  He denied that it was in retaliation for the various "incidents" referred to by Little during his testimony. He also testified that the reason why Little was terminated, as opposed to some lesser discipline being imposed, was not only because Little had used what he determined to be improper and excessive force but also because of (1) the bad example Little had set by doing so in front of his subordinate officers, (2) the fact that Little continued to deny that he had done anything improper, and (3) his concern about liability for future acts by an officer having that mind set.  Finally, Chief Rummel was asked about Little's procedural complaints.  He testified that there was nothing improper about the complaint having been signed by Stenberg based on complaints he had received

from officers who were present on the scene. He also testified that he did meet with Little on the day he was terminated. (Id. at 15-30).

After the completion of the presentation of the evidence, the consensus of the five commissioners was that they wanted more time to consider the testimony and exhibits before making. It was also decided that Little's attorney and the City Attorney should each submit proposed findings of fact, conclusions, and a proposed order. (Id. at pp. 32-33).

On September 10, 2010, the Commission issued its decision, which included detailed findings and conclusions. Notably, the findings framed the issues raised by the parties and referenced Little's testimony about the "incidents" he claimed were the real reason for his discharge. Particularly relevant here are the last four findings and the Commission's conclusions and final order:

> 44. Upon the information and testimony presented, the Civil Service Commission finds that there exists a substantial factual basis for Chief Rummel to have concluded that Mr. Little engaged in excessive use of force.
>
> 45. Upon the information and testimony presented, the Civil Service Commission finds that there exists a substantial factual basis for Chief Rummel to have concluded that Mr. Little was not credible in his explanation of the incident.
>
> 46. Upon the information and testimony presented, the Civil Service Commission finds that Chief Rummel terminated Mr. Little's employment based upon his finding that Mr. Little engaged in excessive use of force in the June 16, 2008 incident.
>
> 47. Upon the information and testimony presented, the Civil Service Commission finds that Chief Rummel did not terminate Mr. Little's employment in retaliation for prior oral complaints made by Mr. Little.

> ### Conclusions
>
> Based upon the foregoing Findings of Fact, the Civil Service Commission makes the following Conclusions.
>
> 1. Chief Rummel acted within his authority and jurisdiction in making the decision to terminate Mr. Little's employment.

2. The evidence available to Chief Rummel furnished adequate legal and substantial basis for his decision to terminate Mr. Little's employment with the City of Dickinson.

3. The reasons given for Mr. Little's termination are not frivolous or arbitrary, but rather are related to the ability, competence, or qualifications of Mr. Little as a Sergeant with the Dickinson Police Department.

4. The reasons given for Mr. Little's termination are sufficient to justify immediate termination of employment.

5. Chief Rummel did not abuse his discretion in deciding to terminate Mr. Little's employment.

6. Chief Rummel's decision was not arbitrary, unreasonable, or unconscionable.

### Order

NOW, THEREFORE, based upon the foregoing Findings of Fact and Conclusions, the Dickinson Civil Service Commission having duly considered the matter and being fully informed, IT IS HEREBY ORDERED as follows:

1. The appeal of Park [sic] Little from his termination of employment is **Denied.**

2. The appeal of Park [sic] Little from the finding of the Chief that he has not been credible in his explanation of this incident is **Denied.**

3. The employee disciplinary action against Park [sic] Little, including his termination from employment, is **Approved.**

(Doc. No. 1-8).

The City's governing ordinances provide for an appeal from a decision of the Civil Service Commission to the City Commission. (Doc. No. 57-1, p. 10).

### G.     The City Attorney's father was one of the Civil Service Commissioners

The City Attorney's father was one of the five commissioners on the Civil Service Commission. He attended the hearing and, presumably, participated in the vote to uphold Little's termination. The City Attorney testified during his deposition that he brought the relationship to the attention of Little's attorney *prior to* the hearing and also discussed with him his opinion that what he believed was the governing statute on conflicts did not prohibit his father's participation. The

City Attorney further testified that his recollection was that Little's attorney did not raise the issue or complain about it at the hearing and he assumed this was because Little's attorney agreed that the statute he relied upon governed as well as his interpretation of it. (Doc. No. 36-4, p. 9). Little's attorney has submitted an affidavit stating it was his recollection that he complained about the City Attorney's father's participation and that, in any event, neither he nor Little had agreed to waive the alleged conflict. (Doc. No. 49-6).

Neither the minutes of the Civil Service Commission meeting nor the hearing transcript reference a discussion about the fact that the City Attorney's father was one of the five commissioners, much less an objection or waiver. However, if the relationship was a problem and to the extent an objection was required to preserve the issue, there is no assurance the minutes are complete. Consequently, there does appear to be a disputed issue of fact as to whether an objection was made if one was necessary. But, if it was not, the City defendants have failed to proffer any evidence of an express waiver.

Finally, no evidence has been presented that the City Attorney's father's vote was a controlling or crucial vote. Further, there is no affirmative evidence that the City Attorney's father exercised undue influence over the other commissioners. During the hearing, several of the commissioners asked questions, including particularly the chairperson Ray Ann Kilen, but not the City Attorney's father. On the other hand, the record of the deliberative process that followed the hearing (if there was one) and the record of the vote have not been made a part of the record.

### H. Little's complaint in this action

#### 1. Overview of the complaint

Little commenced this action by the filing of a *pro se* complaint. (Doc. No. 1). Like many *pro se* complaints, Little's complaint lacks clarity. That and its peculiar organization make it difficult to discern what exactly his claims are. Little later retained counsel, but no effort was made to amend the complaint. Because this is of some consequence later, the court will outline the complaint.

After introductory sections in which Little states he is suing under 42 U.S.C. § 1983 and state law, identifies the parties, and establishes jurisdiction and venue, Little proceeds in his complaint to allege factual information under headings entitled "Incident 1," Incident 2," etc., all the way through "Incident 6." (Doc. No. 1, ¶¶ 9-33). The first four are incidents that occurred before the alleged acts of improper force that are the subject of his disciplinary complaint and are incidents that Little testified to during the Civil Service Commission hearing as being the real reason for his discharge. Incident 5 consists of allegations relating to what happened that resulted in the administrative charges being brought against him, his termination by Chief Rummel, and his having filed for a writ of mandamus to force the City to provide a hearing before the Civil Service Commission. Incident 6 consists of allegations relating to the process that was followed before the Civil Service Commission.

The "incident allegations" are followed by paragraph 34, which alleges that, as result of the conduct of the defendants (purportedly as spelled out in the "incidents"), Little suffered pecuniary losses resulting from his termination and violations of his rights under the First and Fourteenth Amendments, including freedom of speech, freedom of religion, and equal protection under the law.

Little then follows this with the specific pleading of numbered Counts I through IX, with Count VIII being skipped. Count I is a two-paragraph conclusory allegation of violation of § 1983, but does purport to incorporate the prior allegations. Count IX is a similar conclusory claim of violation of § 1983 against the City and Stark County, but again incorporates prior allegations. The remainder of the counts are labeled as claims for "Negligence" against one or more of the individual defendants (even though some allege constitutional violations) and each of the remaining counts is tied to one of the earlier specified "incidents." (Doc. No. 1, ¶¶ 36-60).

### 2. The specific "incidents" and corresponding counts of "negligence"

#### a. Incident 1 and Count II

Little alleges in Incident 1 that, in early 2005, Capt. Stenberg caused Little's supervisor, Lt. Banyai, to issue a verbal order that Little not attend an administrative licensing hearing for a person he arrested and charged with driving under the influence as well as a second verbal order that he not attend the criminal trial. Little claimed the reason for the orders was that the defendant was a friend of Capt. Stenberg. Little claims he attended the administrative hearing and that the criminal trial was later cancelled when the defendant pled. Little alleges that he complained about the two verbal orders to Chief Rummel, contending that the direction that he not appear amounted to a felony, *i.e.*, tampering with witnesses and informants. Little claims Rummel said he would handle the matter, but later that memoranda were issued, one by Chief Rummel and another by Lt. Banyai, reprimanding Little for continuing to discuss the matter with other officers and not letting the matter go. (Doc. No. 1, ¶¶ 9-12).

In Count II, which is entitled "Negligence against Defendant Rummel" and that specifically references Incident 1, Little alleges that Rummel had a duty to protect him by adhering to the

policies and procedures of the Police Department and that Rummel violated this duty by not investigating Little's complaint against Capt. Stenberg for unlawfully causing orders to be issued with respect to Little not attending the administrative hearing and DUI criminal trial. Little alleges that this inaction by Rummel violated his right to freedom of speech under the First Amendment and resulted in his later being terminated. (Doc. No. 1, ¶¶ 38-40).

### b.      Incident 2 and Count III

Little alleges with respect to Incident 2 that he filed a complaint with Chief Rummel on or about April 2007, alleging that certain of his fellow officers had taken fully-automatic weapons out into the county and discharged them while intoxicated. Little alleges he was never informed of what action was taken with respect to his complaint. (Doc. No. 1, ¶¶ 13-14). In Count III, entitled "Negligence against Defendant Rummel" and that specifically references Incident 2, Little alleges that Rummel breached a duty to him by failing to investigate his complaint about the matter and that this later led to his termination. (Doc. No. 1, ¶¶ 41-42).

### c.      Incident 3 and Count IV

In Incident 3, Little alleges that he received a memorandum from Lt. Banyai directing that all personnel attend a mandatory meeting with the police chaplain for spiritual wellness on March 5, 2008. Little alleges that he talked to the attorney for the Fraternal Order of Police about this matter and that the attorney told him he would talk to Chief Rummel about this constitutional violation. (Doc. No. 1, ¶¶ 15-16). In Count IV entitled "Negligence against Defendant Rummel" and that specifically references Incident 3, Little alleges that Rummel had a duty to protect him by upholding the First Amendment and that Rummel infringed upon his right to freedom of religion when he enforced a mandatory meeting with the police chaplain. Little claims that, as a result, he

was deprived of his right to freedom of religion. Unlike the earlier two incidents and counts, as well as those that immediately follow as discussed next, there is no allegation in this Count that the result was that Little was terminated from his employment. (Doc. No. 1, ¶¶ 43-46). Whether this was intentional or simply an oversight is unclear from the face of the pleading. Also, unclear is whether this difference was intended to have any substantive effect.

### d.    Incident 4 and Count V

Little alleges that Incident 4 involved a situation where Rummel, Stenberg, and a third officer named VanDoorne were off-duty and drinking in the Mavericks bar on April 14, 2008, when VanDoorne, in the presence of Rummel and Stenberg, arrested a patron for trespassing after the patron had returned to the bar after having been earlier removed by other officers. Little responded to the bar after the arrest was made and took the patron into custody. Little alleges that he later determined that no one, including the officers who had earlier removed the patron, had advised the patron he could not return. Little alleges that, as a result, the patron should not have been arrested for trespassing and the arrest was false. Little claims he filed a complaint about the unlawful arrest. He claims that on May 19, 2008, he received a memorandum from Lt. Wallace advising that he had discussed the matter with Chief Rummel and that Chief Rummel thanked him for bringing it to his attention and discussing Little's concerns. (Doc. No. 1, ¶¶ 17-22).

In the corresponding Count V, entitled "Negligence against Defendant Rummel and Stenberg" and which specifically references Incident 4, Little alleges that the defendants breached a duty to protect him when they exercised their official duties while off-duty and after consuming alcohol and by their later failure to properly investigate Little's complaint and take appropriate action. Little claims he was later terminated as a result. (Doc. No. 1, ¶¶ 47-50).

### e. Incident 5 and Count VI

The allegations entitled Incident 5 relate to Little's encounters with Tye Maus and Kristi Kuntz that were the subject of his disciplinary complaint. Little details in these allegations what he claims happened, which, essentially, is that he used no improper force, including that he did not lift Kuntz up by the handcuffs' connecting chain. He then details the events surrounding the investigation and his termination. He alleges there were several discrepancies and problems with the complaint form as it was completed. In particular, he points to Stenberg signing and dating the complaint on June 19, 2008, which is two days after Lt. Shirey indicates on the form he received the request to investigate. Also, the date that Lt. Shirey states he received the request to investigate is different from the date that Capt. Stenberg said he assigned the matter for investigation. Finally, more fundamentally, Little takes issue with the fact that Stenberg was both the complainant and the person who made the final review. (Doc. No. 1, ¶¶ 23-28).

In Count VI, entitled "Negligence against Rummel and Stenberg" and that specifically references Incident 5, Little claims that Rummel and Stenberg had a duty to exercise due care in the administration of the City's and the Police Department's personnel policies and that they breached this duty by failing to "accurately complete investigation documents" and by overlooking discrepancies in the complaint. Little claims that the result was that he was terminated from his employment. (Doc. No. 1, ¶¶ 51-53).

Notably, Little does not complain about the lack of a pre-termination hearing. This is of particular import later.

### f. Incident 6 and Count VII

In the allegations labeled Incident 6, Little alleges the following with respect to the post-

termination hearing before the Civil Service Commission:

- that his attorney had requested a copy of all policies and procedures that the City or the Police Department had for disciplinary actions and that the City Attorney only furnished the Police Department's procedures and not the City's;

- that the City Attorney had not notified Little or his attorney that his father was a member of the Civil Service Commission and that neither the City Attorney nor his father recused himself; and

- that Deputy Kitzman of the Stark County Sheriff's Office was instructed by Sheriff Tuhy not to appear at the hearing and produce the County's personnel file despite Little's request.

(Doc. No. 1, ¶¶ 29-33).

In Count VII, entitled "Negligence against Defendants Rummel, Kolling, and Tuhy" and that specifically references Incident 6, Little alleges that the specified defendants had a duty to protect him and his right to equal protection under the Fourteenth Amendment. Little claims that Rummel and Kolling violated that duty by failing to provide the requested discovery documents to Little and his attorney and that Tuhy violated this duty and his equal protection rights by ordering Kitzman not to testify. He also alleges that, as result of the defendants' conduct (that arguably includes all of what was alleged in Incident 6), he was denied a fair hearing and this resulted in his termination. (Doc. No. 1, ¶¶ 54-58).

## II.    DISCUSSION

### A.    The City defendants

#### 1.    Argument that the pre-termination procedure was inadequate

One of Little's primary arguments in his briefing on the pending motions is that his due process rights were violated because he was not afforded adequate pre-termination notice and opportunity to be heard, citing the Supreme Court's decision in Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532 (1985).  The problem with this argument, however, is that nowhere in the complaint is there any mention of a failure to provide a pre-termination hearing, much less an allegation that his rights were violated because one was not provided.  Consequently, the City defendants' objection to the court considering this unpled claim (Doc. No. 53, pp. 3-4) is well taken and the court will not consider it.[3]  E.g., Satcher v. University of Arkansas at Pine Bluff Bd. of Trustees, 558 F.3d 731, 735 (8th Cir. 2009) ("Satcher") (plaintiff could not expand upon his claims

---

[3] The record before the court is underdeveloped with respect to this subject - most probably because the City defendants rightfully assumed it not to be an issue.  Notably, Rummel, Stenberg, and Little were all deposed and no questions were asked of any of them about what took place during the meeting that Rummel and Stenberg had with Little on June 30, 2008, when Little was terminated.  In fact, Little did not even submit an affidavit detailing what occurred, or more relevant to this point, what did not occur during the meeting.  Finally, what evidence is in the record suggests that Little was given sufficient notice and opportunity to be heard prior to his termination.  This includes:

- Chief Rummel's subsequent letter of July 15, 2008 (albeit, perhaps, self-serving), which suggests that there was some discussion with Little about the charges brought against him during the meeting on June 30, 2008.  (Doc. No. 39-5).

- Lt. Wallace's deposition testimony as to what Rummel said following the meeting with Little, which was that Little would only have been demoted if he had been truthful with them about what happened.  And, while Lt. Wallace's testimony is circumstantial and secondhand, it does not appear that Little disputes the testimony since he relies upon it in his own motion for summary judgment.  (Doc. No. 65, p. 12).

- The fact that Little was given the opportunity to present his side of the story with respect to the underlying charges when he was interviewed by Lt. Shirey, the fact that Little's version of what happened was included in Lt. Shirey's report, and the evidence indicating that Stenberg and Rummel had reviewed Lt. Shirey's report prior to Little's termination.

See, e.g., Floyd-Gimon v. University of Ark. for Medical Sciences ex rel. Bd. of Trustees, 716 F.3d 1141, 1146 (8th Cir. 2013); Sutton v. Bailey, 702 F.3d 444, 448-49 (8th Cir. 2012); Young v. City of St. Charles, Mo., 244 F.3d 623, 627-28 (8th Cir. 2001).

by arguing matters not alleged in the complaint); see Christiansen v. West Branch Community School Dist., 674 F.3d 927, 936 (8th Cir. 2012) ("Christiansen") (complaint failed to "plausibly plead" a deprivation of pre-termination process).

## 2. Other due process arguments

### a. Little is only entitled to consideration of those matters referenced in his complaint

In his briefing on the pending motions, Little makes a number of other arguments for why his due process rights were violated. The problem for some of the arguments is that there is no mention of them in the complaint. For example, Little now contends he was denied due process because his post-termination Civil Service Commission hearing was not held until two years after he was discharged. However, there is no mention in the complaint of this being a problem and it would be unfair to the defendants to now consider it.[4] The same is true for his arguments about certain alleged inconsistencies between the requirements of the Police Department's policy manual and the City's personnel policies in terms of the process that should have been followed.

What also makes matters confusing is that Little's most specific allegations of unfairness of the process and that his constitutional rights were violated are in a counts labeled "negligence." However, his summary allegations of violation of 42 U.S.C. § 1983 do incorporate by reference other allegations. That being the case, the court concludes that the due process issues that Little has

---

[4]  When the City initially told Little he was too late in seeking Civil Service Commission relief, he decided to exercise state remedies to force the City to provide a hearing and was given one. Having elected that action, he arguably should not then be heard to complain about the initial six month delay leading up to the decision granting him a hearing - at least absent something more. Cf. Hopkins v. City of Bloomington, Civil No. 12-1943 , 2013 WL 5406671, at *8 (D. Minn. Sept. 25, 2013). Further, with respect to the substantial delay that occurred thereafter, the record is underdeveloped as to the reasons - likely because it was not made an issue in the complaint. And, what little is in the record suggests that the schedules of Little and his attorney were largely the reason for it. (Doc. No. 54-1, p. 31). That being said, the delay of more than two years is troubling. Cf. Coleman v. Watt, 40 F.3d 255, 260 (8th Cir. 1994) (delay of seven days for post-deprivation hearing for seizure of an automobile was excessive).

raised in his complaint are the following:

(1)      Little's contention that it was improper for Capt. Stenberg to have been both the complainant and the person making the final review and the referenced inconsistencies in the complaint document;

(2)      the failure on the part of either the City Attorney or his father to have recused themselves from participation in the Civil Service Commission process;

(3)      the alleged "discovery" failures in terms of not providing a copy of the City personnel manual and the DVD from one of the patrol vehicles;

(4)      Sheriff Tuhy's instructions to Deputy Kitzman to not appear at the Civil Service Commission hearing and provide a copy of Little's county personnel file.

### b.    Failure to exhaust available remedies

Generally speaking, a person seeking relief under 42 U.S.C. § 1983 is not required to exhaust state remedies as a prerequisite to bringing the § 1983 action. See Patsy v. Bd. of Regents, 457 U.S. 496, 516 (1982). However, the Eighth Circuit is one of the courts that has recognized an exception for procedural due process claims. In this case, Little does not dispute that, after the Dickinson Civil Service Commission affirmed his dismissal, he could have sought further review by the Dickinson City Commission. Since Little did not avail himself of this remedy, Little's procedural due arguments fail because of lack of exhaustion. See, e.g., Crooks v. Lynch, 557 F.3d 846, 848-49 (8th Cir. 2009); Wax 'n Works v. City of St. Paul, 213 F.3d 1016, 1019-20 (8th Cir. 2000).[5]

---

[5] While the court does not reach the merits of the due process issues it concludes were raised by Little, the only one that is troubling is the father-son relationship between one of the Civil Service Commission members and the City Attorney, who is a statutory official of the City and who wore several hats during the hearing, including defending the decision to terminate Little. Cf., e.g., Antoniu v. S.E.C., 877 F.2d 721, 724 (8th Cir. 1989) (concluding: (1) it is a
(continued...)

"fundamental premise that principles of due process apply to administrative adjudications;" (2) that a "fair trial" in a "fair tribunal is basic requirement of dues process;" and (3) that fairness requires an absence of actual bias; Morelite Const. Corp. (Div. of Morelite Elec. Service, Inc.) v. New York City Dist. Council Carpenters Benefit Funds, 748 F.2d 79, 84-85 (2d Cir.1984) (father-son relationship between arbitrator and officer of international union of which the party to arbitration was a union local rose to the level of evident partiality requiring vacation of the arbitration award because, according to the court, "we are bound by our strong feeling that sons are more often than not loyal to their fathers, partial to their fathers, and biased on behalf of their fathers"); Mayor & Aldermen of City of Savannah v. Batson-Cook Co., 728 S.E.2d 189, 195(Ga. 2012) (father-son relationship between the judge and attorney for one of the parties required reversal); Kremer v. City of Plainfield, 244 A.2d 335, 338-39 (N.J. Sup. Ct. 1968) (vacating the grant of zoning variance where one of the members of the zoning board of adjustment was an uncle of attorney representing the zoning applicant); 28 U.S.C. § 455(b)(5)(ii) (requiring recusal of judge when a person within the third degree of relationship to the judge is an attorney for one of the parties).

On the other hand, the Supreme Court has observed that disqualification for bias and prejudice was generally not permitted under traditional common-law rules and has been reluctant to find a deprivation of due process, except in the more extreme cases and generally only when the allegedly biased decision-maker has a personal interest. As for disqualification based on other matters, such as "kinship," the Court has suggested (without deciding) that this may simply be a matter of legislative discretion and not a constitutional requirement. See Caperton v. A.T. Massey Coal Co., Inc., 556 U.S. 868, 876-77 (2009); Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 820 (1986); see also Christiansen v. West Branch Community School Dist., 674 F.3d 927, 937 (8th Cir. 2012) ("[M]atters of kinship . . . would seem generally to be matters merely of legislative discretion.") (quoting, Tumey v. Ohio, 273 U.S. 510, 523(1927)). Following this line of argument, the City defendants point out that kinship is not one of the disqualifying factors set forth in N.D.C.C. § 44-04-22, although this may only be a minimum requirement and not dispositive of what is required as a matter of due process under state law. Cf. Mattheis v. City of Hazen, 421 N.W.2d 476, 479-80 (N.D. 1988).

The City defendants also argue that the City Attorney's father was one of five Commission members, that only a quorum was required to act, and there is no indication he was the crucial vote. Again, the United States Supreme Court has not addressed this issue and, so far, its decisions involving multi-person tribunals where it has found a deprivation of due process have been limited to cases where the person with the alleged bias was determined to have provided the crucial vote. See, e.g., Caperton, supra and Lavoie, supra. However, several lower courts (including the Eighth Circuit in Antoniu) have concluded that due process is implicated any time a member of a multi-person tribunal is demonstrated to have been biased even though that member may not have provided the crucial vote. See, e.g., Stivers v. Pierce, 71 F.3d 732, 746-48 (9th Cir. (1995) (citing other cases)); Hicks v. City of Watonga, Okla., 942 F.2d 737, 748-49 (10th Cir. 1991); Antoniu, 877 F.2d at 726. In so concluding, a number of these courts have relied upon the reasoning expressed by the concurring justices in Lavoie for why participation by one tainted member of a multi-person tribunal is enough to implicate due process and that whether the tainted member provided the crucial vote should not be a factor. Lavoie, 475 U.S. at 830-33 (Brennan, Blackmun, & Marshall, JJ., concurring). In North Dakota, the Supreme Court has reached different conclusions about whether the bias of one taints all depending upon the nature of the proceeding. Compare, e.g., Klindt v. Pembina County Water Resource Bd., 2005 ND 106, ¶¶ 24-31, 697 N.W.2d 339 with In re Application of Graves for Admission to Bar of State, 2004 ND 64, 677 N.W.2d 215.

Given the uncertainty of the law in this area, even if participation in the Civil Service Commission hearing by both the City Attorney and his father created a due process problem and the issue had been properly exhausted, City Attorney Kolling would be entitled to qualified immunity. E.g., Baribeau v. City of Minneapolis, 596 F.3d 465, 474 (8th Cir. 2010) (law must be clearly established at the time of the deprivation to overcome qualified immunity). That being said, it is difficult to understand why there was not a recusal, either by the City Attorney or his father, if for no other reason than to foster the perception of fairness.

There appears to be little of substance to the remaining allegations. For example, there was no separate City personnel manual. Rather, all of the City's personnel policies were adopted by ordinance and most, if not all, of the relevant ones, were incorporated in the City Code, both which would have been available from the City Auditor's office

(continued...)

### 3. Retaliation claims

In his briefing on the pending motions, Little contends his termination was in retaliation for his having spoken out about matters related to one or more of the "incidents," including his complaining about having to attend a mandatory "spiritual wellness" meeting with the police chaplain. Again, while his complaint is not entirely clear because of the labeling of the many of the counts as "negligence," the court will construe it has having raised claims of retaliation for exercise of First Amendment rights of both speech and religion.

To establish a prima facie case of First Amendment retaliatory termination, Little must prove that (1) he was engaged in protected conduct; (2) he was discharged from his employment; and (3) his engagement in the protected conduct was a substantial or motivating factor in the defendants' decision to discharge him. See Rynders v. Williams, 650 F.3d 1188, 1194 (8th Cir.

---

[5](...continued)

(see N.D.C.C. § 40-16-03(9)) or, perhaps, even "online" as the City Code is now. In any event, no objection was made by Little's counsel at the hearing about being handicapped by a lack of access to the City's personnel policies. The same is true for the DVD. No objection was made by Little's counsel that it was not played and the record of the hearing indicates it was available for the Commissioners to review if they wanted to see and hear it. (Doc. No. 54-1, p. 30). And, it appears the reason why counsel for Little raised no objection about these matters is not because he was uninformed as Little now speculates but because it was not going to "advance the ball" in terms of Little's case.

With respect to the complaint being initiated by Stenberg and his being the final reviewer, there is no federal due process concern even if this violated the Police Department's or the City's personnel policies, which is doubtful. Cf. Austell v. Sprenger, 690 F.3d 929, 937 (8th Cir. 2012) (not every violation of a state or local procedural requirement will give rise to a due process claim under the federal Constitution); Gordon v. Hansen, 168 F.3d 1109, 1114 (8th Cir. 1999) (alleged combination of investigating and administrative judging functions did not constitute a denial of due process). Also, the alleged "inconsistencies" in the complaint documents are inconsequential and are not enough to give rise to a violation of federal due process.

Finally, as for Sheriff Tuhy and his instruction to Deputy Kitzman not to appear voluntarily on behalf of Little and present the County's personnel file, Little's attorney made no contemporaneous objection or request for a continuance to secure additional evidence. Also, he did not attempt to call Sheriff Tuhy who was in the audience. And, more importantly with respect to the City defendants, there is no evidence that they colluded with Sheriff Tuhy with respect to his not making Deputy Kitzman available on a voluntary basis.

2011); Davison v. City of Minneapolis, Minn., 490 F.3d 648, 654-55 (8th Cir. 2007). What is unclear in the Eighth Circuit for First Amendment retaliation cases, however, is which burden-shifting framework applies when there is no direct evidence of retaliatory motive. That is, whether it is the defendant-friendly tripartite burden-shifting of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) or the framework employed in Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274 (1977). See Bush v. St. Louis County, Mo., No. 4:10CV00544, 2012 WL 1802314, at*3 (E.D. Mo. May 17, 2012) (referencing the conflicting Eighth Circuit precedent); Schaefer v. Yocum, 860 F. Supp. 2d 958, 965 n.5 (D. Neb. Apr. 16, 2012) (same).

In this case, it does not make a difference which burden-shifting framework applies because no reasonable juror could conclude the alleged protected conduct was a substantial or motiving factor in the Civil Service Commission's decision affirming Little's termination, given:

(1)     the Commission had the authority to conclude, if it chose to do so, that the charges against Little had been not substantiated or that some lesser form of discipline was appropriate (Doc. Nos. 54-1, p. 1; 57-1, p. 13);

(2)     Little was given the opportunity to present and make arguments for why the charges were unfounded or, in the alternative, why some lesser from of discipline was more appropriate as indicated by the hearing transcript;

(3)     the Civil Service Commission concluded that Little had engaged in conduct sufficient to justify termination and had also been untruthful about what he had done;

(4)     the evidence presented to the Commission was more than sufficient to support its findings - almost to the point of being overwhelming - given: (a) that all of the witnesses (including Little's fellow line officers) indicated to Lt. Shirey that Little

had used improper force, and (b) that Little denied having engaged in the use of

improper force during the subsequent investigation and continued to deny it at the

hearing; and

(5)      there is no evidence that the Civil Service Commissioners shared the allegedly

wrongful animus that Little claims motivated Rummel and Stenberg.

Consequently, Little's claims of retaliation fail for this reason alone.[6]

### 4.      Denial of equal protection

As noted earlier, Little alleges in Count VII that Rummel and Kolling violated his rights to

equal protection in connection with the process that followed his termination.  Little has failed to

explain why the challenged conduct amounts to a denial of equal protection, much less cite any

authority.  Consequently, his equal protection claim fails for this reason.  Further, even if the

allegations could be construed as implicitly contending he was treated differently from other

employees, he would have alleged nothing more than a "class-of-one" equal protection claim that

the Supreme Court has held to be an invalid theory under the equal protection clause in the public

employment context.  Enquist v. Oregon Dept. of Agriculture, 553 U.S. 591 (2008).

### 5.      Stand-alone claims of constitutional violation for relief apart from that related to Little's termination

What is not clear from the confusing manner in which Little has pled his claims is whether

---

[6] Little presented evidence to the Commission regarding the "incidents" alleged in the complaint and argued he was terminated on account of these "incidents," including his having spoken out about them.  As noted earlier, the Commission made an explicit finding that Chief Rummel had not terminated Little in retaliation for his having spoken out about these matters and concluded he had been properly terminated.  The City defendants raised in their answer the defense of res judicata (Doc. No. 11, p. 11), but did not argue in their briefing on the pending motions that Little was collaterally estopped from relitigating these determinations.  Depending upon North Dakota state law, this may be a defense.  See, e.g., Haberer v. Woodbury County, 188 F.3d 957, 961-63 (8th Cir. 1999); Day v. Minnesota, Civil No. 05-2675, 2007 WL 4321999, at **7-11 (D. Minn. Dec. 6, 2007).

the complaint pleads any stand-alone claims of constitutional violations for which he would be seeking damages apart from those related to his termination from employment. The City defendants in their motion for summary judgment presented arguments for why there would be no liability if Little was making such claims and Little did not respond to them.[7] Consequently, it appears that Little never intended upon asserting any constitutional claims apart from his claims of retaliation and denial of due process, but, even if he did, the court concludes they have been abandoned by the lack of any response. See Robinson v. American Red Cross, __ F.3d __, 2014 WL 2118710, at *3 (8th Cir. May 22, 2014); Satcher, 558 F.3d at 735.[8]

### 6.    State-law negligence claims

Little labels a number of claims as being ones for "negligence." To the extent Little is

---

[7] Of the alleged unconstitutional conduct that the court considered as part of Little's retaliation claim, the most problematic was the directive from his immediate superior, Lt. Banyai, that he attend a potluck gathering sponsored by the "wellness committee" that included a mandatory meeting with the police chaplain to discuss "spiritual wellness." The City defendants contended in their brief that the purpose for the meeting was to familiarize new officers and reacquaint old ones with the services that the police chaplain could offer to crime victims and their families. (Doc. No. 38, pp. 12-13). However, this appears to be after-the-fact "spin" based on vague testimony from Stenberg in which he did not mention crime-victims and their families. (Doc. No. 39-10, p. 11). In fact, the memo from Lt. Banyai requiring attendance clearly suggested something different when it stated in pertinent part:

> On March 5, we will have a wellness committee pot luck. The pot luck will be a get together with our Police Chaplain, Pastor Hessler. He would like to meet the new Officers. Along with this being a wellness function it is a <u>mandatory meeting with Pastor Hessler</u>. Part of the wellness program is spiritual wellness. Sergeants please make arraignments [sic] for you patrol officers to attend.

(Doc. No. 1-2) (emphasis in original). Further, the "wellness committee," which was headed by Lt. Banyai, had sponsored other "wellness" programs for which the focus was the wellness of the individual officers and not crime victims, including programs about exercise and nutrition. (Doc. No. 39-10, p. 11). That being said, even if Little had intended on bringing a freestanding claim for violation of his First Amendment rights, his claim would appear to fail since he named only Chief Rummel, and possibly the City, as defendants to the claim. And here, the record is insufficient to show how, if at all, Chief Rummel was involved with setting up of the meeting and requiring mandatory attendance. In fact, Little's attorney never questioned Rummel about the subject during his deposition. As for the City, there is no evidence that the meeting was held pursuant to a City policy. <u>Cf.</u>, <u>e.g.</u>, <u>Jackson v. Nixon</u>, 747 F.3d 537, 543 (8th Cir. 2014) (no respondeat superior liability under § 1983 for supervisor ); <u>Atkinson v. City of Mountain View, Mo.</u>, 709 F.3d 1201, 1214 (8th Cir. 2013) (same for a municipality).

[8] Little's attorney requested a hearing on the pending motions. During the hearing, the court asked him to list the claims that he believed were in play in the case. He did not once mention any freestanding claims of constitutional violation separate from his claims of violation of due process and unlawful retaliation.

attempting to assert state-law claims for negligence, almost all of them fail as a matter of law for lack of any recognized duty that was owed to him.  Cf. Forsman v. Blues, Brews and Bar-B-Ques, Inc., 2012 ND 184, ¶ 13, 820 N.W.2d 748 (setting forth the elements of a claim for negligence under North Dakota law, which include a recognized legal duty and proximate cause).  For example, he alleges in several of the Counts that one or more of the City defendants owed him a duty to investigate the wrongful conduct of others.  Little has cited no authority from North Dakota or otherwise that would support the existence of such a duty, and the court concludes there was none. Cf. Parkhurst v. Tabor, 569 F.3d 861, 866 (8th Cir. 2009) (citing authority that private citizens lack the right to a criminal investigation or prosecution); Mitchell v. McNeil, 487 F.3d 374, 378 (6th Cir. 2007) ("There is no statutory or common law right, much less a constitutional right, to an investigation."); Koger v. Florida, 130 Fed.Appx. 327, 335 (11th Cir. 2005); Doe v. Mayor and City Council of Pocomoke City, 745 F. Supp. 1137, 1139 (D. Md.1990) ("The Court is not aware of a constitutional, statutory, or common law right that a private citizen has to require a public official to investigate or prosecute a crime.").

Also, as already discussed, there is a lack of any causal connection between the alleged incidents of negligence and the damages that Little appears to claim resulted from his termination given the decision of the Civil Service Commission.  In other words, the negligence claims fail for lack of proximate cause between the allegedly negligent acts and the damages Little is seeking resulting from his termination.

**B.** **The County defendants**

The court agrees with the County defendants that the complaint fails to state a cognizable claim as to them. Little has failed to cite to any authority that it somehow violated Little's constitutional rights for Sheriff Tuhy to instruct Deputy Kitzman not to voluntarily appear in his official capacity at the Civil Service Commission hearing and provide the County's personnel file. The same is true to the extent that Little is attempting to assert some sort of state law claim of negligence. Likewise, Sheriff Tuhy is entitled to qualified immunity with respect to any claim of constitutional violation as well as immunity under N.D.C.C. § 32-12.1-04 for any state-law claim of negligence.

## III. ORDER

Based on the foregoing, it is hereby **ORDERED AND ADJUDGED** as follows:

1.  Little's motion for summary judgment (Doc. No. 64) in his favor is **DENIED**.

2.  The motion summary judgment by the City defendants (Doc. No. 37) is **GRANTED** and the claims against the City defendants ( Rummel, Stenberg, Kolling, and the City of Dickinson) are **DISMISSED WITH PREJUDICE**.

3.  The motion for judgment on the pleadings, or in the alternative, for summary judgment by the County defendants (Doc. No. 35) is **GRANTED** and the claims against the County defendants (Tuhy and Stark County) are **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED.**

Dated this 6th day of June, 2014.

_/s/ Charles S. Miller, Jr._____
Charles S. Miller, Jr., Magistrate Judge
United States District Court